**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | |
|---|---|
| KENNETH W. ADAMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RANKIN COUNTY BOARD OF EDUCATION, et al.,<br><br>Defendants. | Civil Action No. 3:67-CV-04156-TSL-MTP<br><br>**HEARING REQUESTED** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT RANKIN COUNTY SCHOOL DISTRICT'S MOTION FOR DECLARATION OF UNITARY STATUS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 2

PROCEDURAL HISTORY ......................................................................................... 3

a. 1970 Order ........................................................................................................ 3

b. 1973 Consent Order ............................................................................................ 3

c. 1978 Consent Order ............................................................................................ 4

d. 2012 Court Order ................................................................................................ 4

e. Partial Unitary Status and Defendant's Motion for Unitary Status............................ 5

LEGAL STANDARD ................................................................................................. 5

ARGUMENT .............................................................................................................. 7

I. The District Has Failed to Eliminate Racial Discrimination in Student Assignment...... 7

a. The District's Transfer Policy Exacerbates Segregation in the District...................... 9

b. Racial Disparities Persist in Classroom Assignment: the Gifted Program and Advanced Placement Courses.................................................................................11

*i. Racial Disparities in the Gifted Program* ............................................... 12

*ii. Racial Disparities in Advanced Placement Courses* ............................... 14

II. The District Has Failed to Eliminate Racial Discrimination in Faculty and Staff Assignment. ........................................................................................................ 15

a. The District's Lack of Compliance with the Goals of the Court Orders Has Resulted in Schools with Racially Identifiable Faculties. ................................................. 16

b. Metrics Required by the Court Orders Indicate Ongoing Faculty Discrimination... 18

c. The District Has Not Complied in Good Faith with the Court Orders, Much Less Taken All Practicable Steps to Eliminate Discrimination.................................... 20

III. The District Has Failed to Eliminate Racial Discrimination in Quality of Education, Specifically Discipline........................................................................................ 24

a. Race-Based Disparities in Discipline Persist in the District.................................... 25

b. The District Has Made Insufficient Efforts to Eradicate the Vestiges of Segregation. ..................................................................................................... 27

IV. The District Has Failed to Eliminate Racial Discrimination in Extracurricular Activities............................................................................................................ 30

a. Racial Disparities Persist in the District's Extracurricular Activities. ...................... 32

CONCLUSION ........................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Rankin Cnty. Bd. of Educ.*,
485 F.2d 324 (5th Cir. 1973) ....................3, 25, 31

*Anderson v. Sch. Bd. of Madison Cnty.*,
517 F.3d 292 (5th Cir. 2008) ....................30

*Bazemore v. Friday*,
478 U.S. 385 (1986) (White, J., concurring) ....................31

*Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*,
498 U.S. 237 (1991)....................5, 6, 11, 35

*Borel v. St. Martin Par.*,
44 F.4th 307 (5th Cir. 2022) ....................7, 8, 12, 24

*Brown v. Bd. of Educ. of Topeka*,
892 F.2d 851 (10th Cir. 1989), *vacated on other grounds*, 503 U.S. 978 (1992), *reinstated on remand*, 978 F.2d 585 (10th Cir. 1992)....................16

*Coal. to Save Our Children v. State Bd. of Educ.*,
90 F. 3d 752 (3d Cir. 1996)....................31

*Columbus Bd. of Educ. v. Penick*,
443 U.S. 449 (1979)....................15

*Cowan v. Cleveland Sch. Dist.*,
748 F.3d 233 (5th Cir. 2014) ....................1, 5

*Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*,
756 F.3d 380 (5th Cir. 2014) ....................6

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
721 F.2d 1425 (5th Cir. 1983) ....................5, 24

*Dayton Bd. of Educ. v. Brinkman*,
443 U.S. 526 (1979)....................11, 20

*Ellis v. Bd. Pub. Instruction of Orange Cnty.*,
465 F.2d 878 (5th Cir. 1972) ....................8

*Fisher v. Tucson Unified Sch. Dist.*,
652 F.3d 1131 (9th Cir. 2011) ....................5, 14

*Freeman v. Pitts*,
503 U.S. 467 (1992) ............ *passim*

*Green v. Cnty. Sch. Bd. of New Kent Cnty.*,
391 U.S. 430 (1968) ............ *passim*

*Lee v. Conecuh Cnty. Bd. of Ed.*,
634 F.2d 959 (5th Cir. 1981) ............ 18, 19, 23

*Lee v. Etowah Cnty. Bd. of Educ.*,
963 F.2d 1416 (11th Cir. 1992) ............ 27

*Little Rock Sch. Dist. v. Arkansas*,
664 F.3d 738 (8th Cir. 2011) ............ 30

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ............ 6, 15

*Morgan v. Nucci*,
831 F.2d 313 (1st Cir. 1987) ............ 34

*Plaquemines Par. Sch. Bd. v. United States*,
415 F.2d 817 (5th Cir. 1969) ............ 30

*Quarles v. Oxford Mun. Separate Sch. Dist.*,
868 F.2d 750 (5th Cir. 1989) ............ 7, 31, 32, 35

*Singleton v. Jackson Mun. Separate Sch. Dist.*,
541 F. Supp. 904 (S.D. Miss. 1981) ............ 31

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) ............ *passim*

*Thomas v. St. Martin Par.*,
544 F. Supp. 3d 651 (W.D. La. 2021), *aff'd in relevant part sub nom. Borel ex rel. AL v. Sch. Bd. of St. Martin Par.*, 44 F.4th 307 (5th Cir. 2022) ............ *passim*

*United States v. Fletcher*,
805 F.3d 596 (5th Cir. 2015) ............ *passim*

*United States v. Fordice*,
505 U.S. 717 (1992) ............ 5

*United States v. Gadsden Cnty. Sch. Dist.*,
572 F.2d 1049 (5th Cir. 1978) ............ 11

*United States v. Lawrence Cnty. Sch. Dist.*,
799 F.2d 1031 (5th Cir. 1986) ............ 17, 21

*United States v. Lowndes Cnty.*,
878 F.2d 1301 (11th Cir 1989) ....................................................................................10

*United States v. Mississippi*,
No. 70 CV 4706, 2011 WL 13389133 (S.D. Miss. Dec. 22, 2011) ............................11, 31, 32

# INTRODUCTION

Following the Court's 1967 Order permanently enjoining Defendant Rankin County School District (the "District" or "RCSD") from discriminating on the basis of race in the operation of its school system, the Court entered a series of orders setting forth the District's obligations to cure its constitutional violation. The goal of every desegregation case is to eliminate the vestiges of past racial segregation to the extent practicable and attain unitary status. The passage of time, however, does not lessen the District's constitutional burden to demonstrate it has complied with the Court's orders, nor does it diminish the District's obligation to provide equal educational opportunities for Black schoolchildren.

To be sure, RCSD has changed significantly since 1967 when a class of Black children eligible to attend school in Rankin County ("Plaintiffs") initiated this case. Compl., Dkt. 83-1 at 2. Despite this progress, vestiges of a dual school system remain, evidenced by racially identifiable schools, persistent disparities in enrollment in advanced and specialized courses, barriers to hiring and advancement of Black faculty, disproportionate discipline against Black students, and lack of full inclusion in extracurricular activities. While Plaintiffs share the goal of seeing the District achieve unitary status, the District cannot satisfy its burden to be declared unitary. On the remaining factors over which the Court retains jurisdiction, the District has not complied with many of its Court-ordered obligations. Even assuming the District had fully complied, marked disparities persist and the District must take the additional steps necessary to eliminate the vestiges of segregation "root and branch." *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 238 (5th Cir. 2014) (quoting *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 437-38 (1968)). Evidence shows there is more the District could do to address these racial disparities and barriers to opportunity. Indeed, District administrators identified several efforts they plan to implement or are considering.

While admirable, these promises cannot support a declaration of unitary status and are themselves evidence that the District has not yet "made every reasonable effort to eradicate segregation and its insidious residue." *United States v. Fletcher*, 805 F.3d 596, 601 (5th Cir. 2015) (internal alternations and citations omitted). Accordingly, Plaintiffs urge the Court to deny the District's Motion for a Declaration of Unitary Status.[1] Dkt. 98.

Plaintiffs respectfully request an evidentiary hearing on the District's motion to fully present relevant evidence including fact and expert testimony.

**FACTUAL BACKGROUND**

Rankin County School District is the second largest school district in Mississippi, operating twenty-eight schools in eight attendance zones. Dkt. 99 at 1. In the 2023-24 school year, there were 18,333 students enrolled in the District, including 5,104 (27.8%) Black students, 11,921 (65%) white students, and 1,308 (5.1%) students of other races. Dkt. 98-3 at 1-2. Multiple District schools were racially identifiable at times during the last five years, a pattern that has become more pronounced. Ex. A, Expert Report of Erica Frankenberg ("Frankenberg") at 6-7. While the number of Black teachers and administrators has increased, several schools persistently have few to zero Black faculty, administrators, coaches, or activity sponsors. Many of the racially identifiable schools and those with low representation of Black faculty and staff are in the Pelahatchie, Pisgah, and Puckett attendance zones, which were historically white under *de jure* segregation. Dkt. 83-1 at 4. Disparities persist across the District, including disproportionate discipline of Black students and underrepresentation of Black students in many extracurricular activities.

[1] Should the Court deny the District's motion, Plaintiffs request the opportunity to submit a motion for further relief to assist the Court in crafting the remedy. Plaintiffs remain committed to working with the District to develop appropriate remedial measures.

## PROCEDURAL HISTORY

On August 1, 1967, Plaintiffs initiated this action, alleging that the District continued to operate a racially segregated school system more than thirteen years after the Supreme Court declared *de jure* segregation in public schools unconstitutional in *Brown v. Board of Education*. Dkt. 83-1. The Court swiftly and permanently enjoined the District's unconstitutional conduct, prohibiting it "from discriminating on the basis of race or color in the operation of the Rankin County School system" and ordering it to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual system." Dkt. 7 at 3 (September 26, 1967 docket entry describing Judgment).

### a. 1970 Order

On April 3, 1970, the Court entered an Order ("1970 Order") that set out a Unitary School Plan in the District, identifying six areas for improvement: (1) desegregation of faculty and staff, (2) majority-to-minority transfer policy, (3) student transportation, (4) school construction and site selection, (5) attendance outside system of residence, and (6) pupil assignment. Dkt. 83-2 at 13-15. The Court subsequently allowed the United States to participate in the case as amicus curiae, granting the Department of Justice non-party status and authority to "initiate any proceedings that may be necessary." Dkt. 7 at 6 (February 26, 1971 docket entry).

### b. 1973 Consent Order

After little progress, the Fifth Circuit held that the District had failed to establish a unitary system and directed the District to take additional steps to meet its obligations under the law. *Adams v. Rankin Cnty. Bd. of Educ.*, 485 F.2d 324 (5th Cir. 1973). On remand, the Court entered a new Order ("1973 Order") that set out specific requirements, including, among other things, modifications to student attendance zones, elimination of segregated classes, reinstatement of a

full schedule of extra-curricular activities and events for all students, and semi-annual reporting to the Court on the District's progress. Dkt. 83-3 at 1-5.

**c. 1978 Consent Order**

In July 1976, Pearl Public School District ("PPSD") was established as a separate school district geographically surrounded by Rankin County. On August 18, 1978, the Court entered an additional Consent Order ("1978 Order"), applying to both RSCD and PPSD. *See* Dkt. 83-4 at 5. Among other requirements, the 1978 Order modified the attendance zones, required that the percentage of Black students in any school not exceed 45% or fall below 12%, required Defendants to take affirmative steps to ensure a proportionate participation of Black students and faculty in activities, ensured representation in all professional, administrative and non-professional employment areas, required the District to achieve a percentage of at least 28% Black staff at every grade level and in all employment categories, and established reporting requirements. *Id*. at 3-5. The 1978 Order was "supplemental" to the 1970 Order and 1973 Order, and "all matters not inconsistent with those orders remain[ed] in full force and effect." *Id*. at 5.

**d. 2012 Court Order**

In 2012, the Court entered a Consent Order ("2012 Order") to settle a dispute between RCSD and PPSD over their attendance zone boundaries. Dkt. 82. The 2012 Order also set forth requirements related to student assignment, ordering that the racial composition of enrollment at each school within RCSD must reflect the racial composition of the District as a whole, and the Black percentage and white percentage of enrollment at each school should not deviate more than twenty percent from the overall District percentage of Black students or white students, respectively. *Id.* at 8. The 2012 Order did not include a similar standard for faculty assignment.

**e. Partial Unitary Status and Defendant's Motion for Unitary Status**

In 2019, the District filed an Unopposed Motion for Declaration of Partial Unitary Status in the areas of transportation and facilities. Dkt. 88. The Court granted the District's motion, holding that the District had achieved unitary status in transportation and facilities but the Court would "maintain jurisdiction over the areas of extracurricular activities, faculty assignment, staff assignment, student assignment, and quality of education." Dkt. 90 ("2019 Order") at 13.

On August 2, 2024, the District filed a Motion for Declaration of Unitary Status, asking the Court to declare it unitary in all remaining areas, dissolve all injunctions, and dismiss the case with prejudice. Dkt. 98. For the reasons below, the Court should deny the motion.

**LEGAL STANDARD**

Following the Supreme Court's rulings in *Brown* and *Brown II*, "[t]he duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Freeman v. Pitts*, 503 U.S. 467, 485 (1992). "The duty is not simply to eliminate express racial segregation: where *de jure* segregation existed, the school district's duty is to eliminate its effects 'root and branch.'" *Cowan*, 748 F.3d at 238 (quoting *Green*, 391 U.S. at 437-38).

To obtain unitary status, a district must show that it has "complied in good faith with the desegregation decree since it was entered, and [that] the vestiges of past *de jure* discrimination [have] been eliminated to the extent practicable." *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 249-50 (1991). The school district bears the "heavy burden" of making this showing. *Davis v. E. Baton Rouge Par. Sch. Bd.*, 721 F.2d 1425, 1430 (5th Cir. 1983); *United States v. Fordice*, 505 U.S. 717, 729 (1992). This burden requires "demonstrating – not merely promising – [] 'good-faith compliance,'" *Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1143-44 (9th

Cir. 2011) (quoting *Freeman*, 503 U.S. at 498), and making "every reasonable effort . . . to eradicate segregation and its insidious residue," *Fletcher*, 805 F.3d at 601 (citation omitted).

The "[p]roper resolution of any desegregation case turns on a careful assessment of its facts." *Freeman*, 503 U.S. at 474. A school district must offer proof that enables the court to make precise factual findings that: (1) the district has fully and satisfactorily complied with the court's decrees, (2) "the vestiges of [*de jure* segregation] have been eliminated to the extent practicable," and (3) the district has demonstrated a "good-faith commitment to the whole of the courts' decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *Missouri v. Jenkins*, 515 U.S. 70, 87-89, 101 (1995) (citation omitted); *Freeman*, 503 U.S. at 491, 498; *Dowell*, 498 U.S. at 246 ("[A] school board is entitled to a rather precise statement of its obligations under a desegregation decree. If such a decree is to be terminated or dissolved, [Black students and their parents] as well as the school board are entitled to a like statement from the court.").[2]

To determine whether a school district is unitary, courts look at "every facet of school operations." *Dowell*, 498 U.S. at 250. A school district must demonstrate it has eliminated the vestiges of discrimination in six areas outlined in *Green v. School Board of New Kent County*: (1) student assignment (including in-between school assignment and classroom assignment); (2) faculty assignment; (3) staff assignment; (4) extracurricular activities; (5) facilities; and (6) transportation.[3] 391 U.S. 430, 435 (1968). These *Green* factors are "among the most important indicia of a segregated system." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18 (1971), and they are often "intertwined or synergistic . . . so that a constitutional violation in one

---

[2] *See also Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380, 387 (5th Cir. 2014) (affirming denial of a motion to dismiss for lack of jurisdiction because the order that the school board argued granted unitary status was ambiguous and lacked the precise factual findings required by *Dowell*).

[3] RCSD has been declared unitary on the *Green* factors of facilities and transportation. Dkt. 90.

area cannot be eliminated unless the judicial remedy addresses other matters as well." *Freeman*, 503 U.S. at 497. However, they are not a "rigid framework." *Id.* at 493.

In addition to the *Green* factors, federal courts may examine other factors, such as the relative "quality of education" offered to Black and white students, in determining whether a district is unitary. *Id.* at 482-83; *Borel v. St. Martin Par.*, 44 F.4th 307, 314-15 (5th Cir. 2022). This may include considering the frequency and severity of discipline accorded Black and white students and relative access to graduation pathways. *Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 755–56 (5th Cir. 1989); *Borel*, 44 F.4th at 315.

## ARGUMENT

### I. <u>The District Has Failed to Eliminate Racial Discrimination in Student Assignment.</u>

In determining whether a district is unitary, the critical beginning point is "the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of races in the district as whole." *Freeman*, 503 U.S. at 474. Here, the Court ordered that at no point should the percentage of Black students in any school exceed 45 percent or go below 12 percent, Dkt. 83-4 at 3, and that the percentage of Black students and percentage of white students at each school should not deviate more than twenty percent from the overall district percentage of Black students or white students, respectively, Dkt. 82 at 8. The District is not in compliance and has made no effort to remedy this. Recent enrollment data is informative:

First, since 2021, multiple schools have fallen outside the +/-20% standard.[4] In 2021-22, Florence Elementary (87.6% white) and Pisgah Elementary (86.2% white) were racially

[4] This is based on a comparison of enrollment data at a specific school with the District-wide average for elementary or secondary schools, respectively. *See Borel*, 44 F.4th at 315 (assessing whether the percentage

identifiably white schools. Frankenberg at 6. In 2023-24, Florence Middle and Pisgah High were racially identifiably white: 85.5% of the student population at Florence Middle and 86.3% at Pisgah High was white. *Id*. at 9. Meanwhile, for the past three years, Flowood Elementary has been racially identifiably Black: the white student population has ranged from 44% to 46 %, falling below the +/-20% variance. *Id.* at 6-7. The District has also violated the 1978 Order's between-school assignment provision. In 2022-23 the Learning Center's Black population exceeded 45%. *Id*. at 9. Notably, the racially identifiable white schools are consistently in the attendance zones that were historically white under *de jure* segregation. *See* Dkt. 83-1 at 4.

Second, segregation in some of the District's majority white and racially identifiable white schools has become more pronounced.[5] Between 2018-19 and 2023-24, Pisgah Elementary's white enrollment increased from 83.1% to 85.2%, and Pisgah High's white enrollment jumped from 81.1% to 86.3%.[6] Meanwhile, the Black student population at both schools decreased from 14.3% to 12.3% and from 16.4 % to 12.6 %, respectively. *Id.* Steen's Creek Elementary and Florence Middle School's white student populations also increased from 83.8% to 84.1% and 83.4% to 85.5%, respectively, *id*., placing both schools farther outside of a +/-15% variance. Puckett Elementary jumped from 74.8% to 82.3% in 2023-24. *Id*. The racially identifiably white character of these schools—which were historically white schools under *de jure* segregation—is a vestige of that dual system. *See Ellis v. Bd. Pub. Instruction of Orange Cnty.*, 465 F.2d 878, 880 (5th Cir.

---

of Black or white students enrolled in a particular school was outside the variance of the District-wide enrollment for that grade band).

[5] While the 2012 Order requires a +/-20% variation, we also note schools outside the +/-15% standard, "a typical standard used in school desegregation literature[,]" Frankenberg at 5, and a standard employed by the District's own expert. *See* Dkt. 98-2 at 9; *see also Borel*, 44 F.4th at 314−15 (determining that a district was not unitary where three of its sixteen schools failed to satisfy the "agreed-upon metric" of a +/-15% variance).

[6] In the past five years, Pisgah Elementary, Puckett Elementary, and Steen's Creek Elementary have all fallen outside the +/-15% variance, while Florence Middle and Pisgah High has fallen outside the +/-20% variance. Frankenberg at 6-9.

1972) (certain schools were vestiges because they "have never been desegregated and were a part of the dual school system."). Despite this showing, the District represented that it does not believe that it has any racially identifiable schools (Ex. B, Deposition of Amanda Stocks ("Stocks Tr.") at 21:11-15) and has not taken any steps to address schools that are growing increasingly segregated or schools that are in violation of the 2012 and 1978 consent orders.

To support its motion, the District attempts to compare RCSD's student demographics to school districts that have obtained unitary status. Dkt. 99 at 12. This argument is unavailing. Every school district is unique, (Stocks Tr. at 15:22-16:1, Ex. C, Deposition of Angy Graham ("Graham Tr.") at 12:21-24), and its unique characteristics impact the extent of student desegregation that is practicable, but the District's expert did not control for any of the multitude of varying factors. Ex. D, Deposition of Christine Rossell ("Rossell Tr.") at 72:2-73:13.[7] Further, the comparator school districts were governed by court orders that may have imposed different obligations and different standards for compliance than those in this case. *Id.* at 72:23-76:1. As Dr. Erica Frankenberg, who has extensive experience studying and publishing about student and teacher segregation, explained: "[t]his makes comparisons between an arbitrarily selected sample districts not useful to analyzing desegregation in RCSD." Frankenberg at 2, 10.

**a. The District's Transfer Policy Exacerbates Segregation in the District.**

The District is also in violation of this Court's orders because it has failed to take appropriate steps to ensure that student transfers do not exacerbate segregation. The District has the burden to establish that transfers further, rather than undermine, its obligation to desegregate. *Swann*, 402 U.S. at 26-27. The 1970 Order requires that any student transfer request to attend a

[7] With permission from the Court, in advance of any hearing, Plaintiffs plan to file a *Daubert* motion to exclude several of Dr. Christine Rossell's findings on the grounds that her analysis is not "the product of reliable principles and methods" or otherwise does not satisfy Federal Rule of Evidence 702.

school outside the student's zone of residence must be done on a "non-discriminatory basis" and must not "reduce desegregation" or "reinforce the dual school system." Dkt. 83-2 at 14. The Order also permits majority-to-minority student transfers where students whose race is in the majority wish to transfer to a school where their race is in the minority ("M-to-M transfer"). *Id.* Despite the fact that multiple District schools are not only majority Black or majority white, but are also racially identifiable, *see supra* at 7-9, the District takes the bizarre position that its "demographics do not create a scenario in which the majority-to-minority program is implicated." Dkt. 99 at 13 n.6.

Intra-district transfers and this lack of M-to-M transfers have caused racial segregation in RCSD to *increase*. District transfers at the elementary school level highlight this trend. For instance, Pisgah Elementary and Steen's Creek Elementary have both been majority white schools (above the +/-15% variance) at least once in the past five years. Nonetheless, in 2022-23, 21 white students but only 1 Black student transferred into Pisgah Elementary, and 11 white students and zero Black students transferred into Steen's Creek Elementary, Frankenberg at 11, exacerbating racial segregation. Intra-district transfers out of Flowood Elementary, a racially identifiable Black school, have also further exacerbated racial segregation. *Id*. In 2022-23, 8 white students transferred out of Flowood Elementary, compared to 4 Black students. *Id*.

The District has taken no steps to ensure that transfers do not have a segregative effect. The District's 30(b)(6) deponent testified she is unaware of any intra-district transfer requests that have been denied in order to meet desegregation obligations. Stocks Tr. at 50:20-51:1; *see also United States v. Lowndes Cnty.*, 878 F.2d 1301, 1308 (11th Cir 1989) (holding transfer policy that "obstruct[ed] the goals of desegregation" constitutionally impermissible). And while M-to-M transfers are "an indispensable remedy" for desegregation, *Swann*, 402 U.S. at 26-27, and a remedy

that this Court ordered in its 1970 Order, RCSD does not even attempt to use this tool because it believes its demographics do not "implicate" the program. Dkt. 99 at 13 n.6. Until the District has been declared unitary in student assignment, however, the District is subject to the 1970 Order, including the M-to-M provision, and must "make every reasonable effort to eradicate segregation." *Fletcher*, 805 F.3d at 601 (citation omitted). Moreover, the District must take steps to make the M-to-M program accessible and attractive to students. *See Swann*, 402 U.S. at 26-27 (ordering district to grant M-to-M students free transportation and space in the school to which they desired to move in order to make the program effective). RCSD's lack of compliance with desegregation obligations—and outright defiance of the 1970 Order's M-to-M provision—makes clear that the District has not met its burden. *See Dowell*, 498 U.S. at 247 (requiring the court to inquire whether it is "unlikely that the school board [will] return to its former ways").

**b. Racial Disparities Persist in Classroom Assignment: the Gifted Program and Advanced Placement Courses.**

A district cannot meet its burden where it has replicated a dual system through segregated classes within schools. *See United States v. Mississippi*, No. 70 CV 4706, 2011 WL 13389133, at *7 (S.D. Miss. Dec. 22, 2011) ("Segregation within a school that is racially balanced overall may be as troubling as segregation between schools."). Racial disparities in classroom assignment, including the underrepresentation of Black students in more academically rigorous courses, are presumed to be the product of discrimination. *See Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538 (1979); *United States v. Gadsden Cnty. Sch. Dist.*, 572 F.2d 1049, 1050 (5th Cir. 1978). And the 1973 Order mandates that "no classroom or grade section shall be identifiable as tailored for a heavy concentration of either white of black students unless there exists a comparable concentration of either white of black students in the relevant grade or course offering as a whole." Dkt. 83-3 at 3. Stark racial disparities in RCSD's gifted program and advancement placement

courses show the District is not unitary in classroom assignment. *See Borel*, 44 F. 4th at 315-16 (denying unitary status where district failed to "take steps to eliminate and avoid, to the extent practicable, racial disparities" in enrollment in the "more academically challenging" program).

*i. Racial Disparities in the Gifted Program*

RCSD offers the Venture Program, an enriched curriculum for select students in grades 1-8 "to provide optimal opportunities for gifted students to realize their maximum potential." Ex. E, Venture Program flyer. Students in Venture receive instruction from specially trained teachers for at least five hours per week, Frankenberg at 12, and work toward goals such "as development of leadership and decision-making skills," Ex. E, Venture Program flyer. District wide, 22% of RCSD's approximately 18,333 students are Black. But in both 2021-22 and 2022-23, only 140 Black students were referred for the Venture program. Frankenberg at 13-15. In other words, Black students comprised just 12.8% of gifted students in grades 1-8 District wide. *Id.* at 13. In 2021-22, Pisgah High and Puckett Elementary referred zero Black students and in 2022-23, Richland Elementary and Steen's Creek Elementary referred zero Black students for Venture. *Id.* at 13-14.

The District's expert attributes the underrepresentation of Black students in Venture to Black students' lower test scores and Black students' (or parents') refusal to enroll even when identified as eligible for the program, Dkt. 147-1 at 4, but offers no valid evidence of either. Dr. Rossell did not review data from the screener test or IQ test that RCSD uses to determine gifted eligibility, nor did she review any other RCSD test score data.[8] Rossell Tr. at 30:24-31:9, 149:1-11. Further, District administrators and Dr. Rossell could not point to a single instance of parents

[8] Dr. Rossell instead bases her conclusions on national data from two standardized tests, but this data cannot support a conclusion that Black students score lower on the District's gifted tests. Not only are these tests not used for gifted identification, one data set is a decade old, and the other consists of test scores for 8th graders, which is not a grade level that is tested for gifted eligibility. Dkt. 147-1 at 4-5; Rossell Tr. at 143:24-144:8.

not giving permission or failing to return the required information to enroll their child. Ex. F, April 10 Deposition of Undray Scott ("Scott 4/10 Tr.") at 14:6-18; Rossell Tr. at 145:3-6, 11-14.[9]

RCSD asserts that it has taken steps to increase Black student enrollment in Venture. Scott 4/10 Tr. at 6:2-24, 11:6-15, 16:6-18. For example, RCSD universally screens all first and second graders for gifted identification, whereas in the past the District screened only first graders. *Id*. at 6:10-15. Although generally a score in the 90th percentile or above is required to advance beyond the screener, the District has relaxed that requirement, allowing students who score as low as 84th percentile to advance. *Id*. at 11:6-15. While Plaintiffs acknowledge that this is a promising step that has yielded initial positive results, *see id*. at 16:6-17, it is impossible to assess the efficacy of these changes based on data from only two school years. It is, instead, appropriate for this Court to retain jurisdiction until the District has demonstrated at least three years without circumstances adverse to desegregation in Venture and other aspects of student assignment. *Thomas v. St. Martin Par.*, 544 F. Supp. 3d 651, 663 (W.D. La. 2021), *aff'd in relevant part sub nom. Borel ex rel. AL v. Sch. Bd. of St. Martin Par.*, 44 F.4th 307 (5th Cir. 2022) ("The Fifth Circuit has held that a period of three years without circumstances adverse to desegregation is adequate to show a reasonable period of time acting in good faith.") (collecting cases).

Moreover, RCSD can do more to ensure Black students have opportunities to enroll in Venture. Universal screening is an important way to reduce bias, but RCSD has declined to implement this outside of the second grade. Scott 4/10 Tr. at 9:6-18. As a result, the District relies solely on referrals to identify students for screening in third through seventh grade, and overall, teacher referrals account for the majority of students screened for gifted. Frankenberg at 16; Scott

[9] Dr. Rossell's pure speculation that Black students decline to participate in Venture even when eligible is based solely on unsubstantiated assumptions that Black students do not want to be perceived as "acting white," but she offers no evidence from surveys, interviews, academic literature, or any other source to support this conjecture. Rossell Tr. at 145:15-24.

4/10 Tr. at 8:7-11. The subjective nature of referrals introduces potential bias into the process. Frankenberg at 16. Research also shows that a higher proportion of Black teachers is related to identification of more Black students as gifted. *Id*. at 15. At RCSD, gifted teachers train other teachers on how to identify students to refer for gifted screening, Scott 4/10 Tr. at 20:17-19, but regrettably, the District has only one Black gifted teacher. Frankenberg at 16. Thus, the District's efforts to increase Black representation in Venture are linked to its failure to increase Black faculty. *See infra* Section II; *see also Freeman*, 503 U.S. at 497 ("[S]tudent segregation and faculty segregation are often related problems.").

*ii. Racial Disparities in Advanced Placement Courses*

Stark racial disparities persist in Advanced Placement English enrollment.[10] For instance, in 2022-23 at Florence High and Pisgah High, there were zero Black students enrolled in AP English. Frankenberg at 18. The District has not made any good faith effort to address this.

First, RCSD cannot track racial disparities because it does not consistently track or review AP enrollment data. Graham Tr. at 50:11-20. Second, until the 2024-25 school year, instructor approval was required for enrollment in certain AP courses and enrollment criteria for gifted and honors courses was not standardized. *Id.* at 31:12-14; Ex. G, District's Response to Plaintiffs' Interrogatory No. 7. This introduces subjectivity and the risk of bias. Graham Tr. at 36:3-10. The District indicates that it will no longer require instructor approval in order to increase inclusion and that enrollment criteria will be standardized. However, this will not go into effect until the 2025-26 school year. *Id.* at 35:7-16. The District's pledge of future efforts cannot support a finding of unitary status. *See Fisher*, 652 F. 3d at 1143-44 (the school district "me[e]ts its burden by

[10] The District also provided Plaintiffs with special education data. However, the data provided was unclear. *See* Frankenberg at 17. The District has provided no evidence related to special education that demonstrates a lack of racial disparities and thus has not met its burden to demonstrate it is unitary.

*demonstrating*—not merely promising—its good-faith compliance”) (internal quotation marks omitted). Instead, this shows that the District has not yet taken all necessary steps to reduce persistent disparities.

## II. **The District Has Failed to Eliminate Racial Discrimination in Faculty and Staff Assignment.**

The District may obtain unitary status in faculty assignment only if it proves that (1) “the racial composition of a school’s faculty does not indicate that the school is intended for either African-American or white students;” (2) its “current employment practices are non-discriminatory and in compliance with constitutional standards;” and (3) it has “eliminated the vestiges of past discrimination to the extent practicable.” *Fletcher*, 805 F.3d at 601 (internal alterations and citations omitted). A district must go beyond minimal compliance with court orders: “The ultimate inquiry is ‘whether the [District] has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable.’” *Jenkins*, 515 U.S. at 89 (citation omitted); *Freeman*, 503 U.S. at 491 (district must demonstrate “full and satisfactory compliance” with the consent order); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 459-60 (1979).

The District has failed to meet its burden under the standards established by *Fletcher*. First, the District has failed to demonstrate compliance with the goals set forth in the operative consent orders, resulting in schools with faculty that “indicate that the school is intended for either African-American or white students.” *Fletcher*, 805 F.3d at 601. Second, lack of Black representation in faculty leadership and other statistics indicate ongoing discrimination in hiring and promotion. *Id.* Finally, the District has not taken steps to eliminate discrimination to the extent practicable. *Id.*

**a. The District's Lack of Compliance with the Goals of the Court Orders Has Resulted in Schools with Racially Identifiable Faculties.**

Racially identifiable faculty are "among the most important indicia of a segregated system." *Swann*, 402 U.S. at 18. "Because faculty/staff assignment is largely within the control of the school district, it is a potent tool for demonstrating that the district does or does not itself identify certain schools as white or minority." *Brown v. Bd. of Educ. of Topeka*, 892 F.2d 851, 872 (10th Cir. 1989), *vacated on other grounds*, 503 U.S. 978 (1992), *reinstated on remand*, 978 F.2d 585 (10th Cir. 1992).

After over fifty years under the operative court orders, the District continues to operate schools whose faculty composition and student enrollment plainly signal that they are for white students. During the 2021-22 and 2022-23 school years, Puckett Elementary had no Black teachers and employed an entirely white faculty. Frankenberg at 25. During the 2023-24 school year, the school employed only one Black teacher. *Id*. That same year, the school was racially identifiably white based on a +/-15% standard, the metric used by the District's own expert. *See* Frankenberg at 7; Dkt. 98-2 at 8-9. Similarly, during the 2022-23 and 2023-24 school years, Pisgah High had no Black teachers and employed an entirely white faculty. Frankenberg at 25. During those same years, Pisgah High was also racially identifiably white based on a +/-20% standard. Frankenberg at 9. Notably, each of these schools operated in white attendance zones under *de jure* segregation. *See* Dkt. 83-1 at 4. Finally, across the 2021-22, 2022-23, and 2023-24 school years, McLaurin Elementary and the Learning Center both had racially identifiably Black faculty. *See* Frankenberg at 26-28.

Schools with effectively one-race teaching staff establish a *prima facie* violation of the requirement that "in no case will the racial composition of a staff indicate that a school is intended for [Black] students or white students." Dkt. 83-2 at 13; *see Swann*, 402 U.S. at 18 ("where it is

possible to identify a 'white school' or a '[Black] school' simply by reference to the racial composition of teachers . . . a *prima facie* violation of substantive constitutional rights under the Equal Protection Clause is shown.").

In addition to the above, both Pisgah Elementary and Puckett Elementary had only one Black teacher during the 2023-24 school year. *See* Frankenberg at 28. While these schools may technically fall within the +/-15% standard for racial identifiability employed by the District's expert, the racial isolation of Black faculty at these schools increases their likelihood of attrition. *See id.* at 25-26. Notably, both schools operated in white attendance zones under *de jure* segregation, and the vestiges of that segregation persist in each school's faculty representation today. *See* Dkt. 83-1 at 4. And across the board, the District is falling short of the minimum twenty-eight percent level of Black staff required by the 1978 Order by over ten percentage points among middle and high school teachers and over fifteen percentage points for elementary school teachers. *See* Frankenberg at 29. When confronted with this fact, the District's Director of Human Resources admitted that the District has not explored why this disparity is worse at the elementary level. Ex. H, Deposition of Anitra Hollis ("Hollis Tr.") at 106:9-11.

These persistent disparities reflect "intentional acts by the School Board before desegregation [that] insured that the immediate communities around those schools would be of one race." *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1044 (5th Cir. 1986). Where such vestiges remain, "an assignment plan is not acceptable simply because it appears to be neutral." *Swann*, 402 U.S. at 28. Instead, where a District "persists in segregative actions under a veil of neutrality, . . . both the Constitution and the court order . . . require[], not just warrant[], more than an order to obey the decree." *Lawrence Cnty.*, 799 F.2d at 1044.

**b. Metrics Required by the Court Orders Indicate Ongoing Faculty Discrimination.**

"[A] school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness." *Swann*, 402 U.S. at 25. The District claims that because it has increased the proportion of Black faculty, "the evidence supports RCSD's successful efforts in eradicating any evidence of segregation regarding faculty and staff." Dkt. 99 at 21. But here, in addition to the continuing racial identifiability of faculty at certain schools as outlined above, evidence shows that Black candidates are disadvantaged in hiring relative to white candidates and that Black faculty have been consistently excluded from leadership positions. The District bears the heavy burden of proving "by clear and convincing evidence" that this is not the result of ongoing discrimination against Black teachers. *See Lee v. Conecuh Cnty. Bd. of Ed.*, 634 F.2d 959, 963-64 (5th Cir. 1981).

Despite the operative court orders' mandate that staff be hired without regard to race and that the District take affirmative steps to ensure proportionate representation in all areas of employment, Dkt. 83-2 at 13-14; Dkt. 83-4 at 3-5, data shows that Black candidates are disadvantaged in the District's hiring processes. After reviewing the District's hiring spreadsheets, Dr. Frankenberg concluded that "when Black candidates scored competitively on hiring rubrics, they were not selected even when they would have aided faculty desegregation goals." Frankenberg at 34. Indeed, Dr. Frankenberg found at least twenty-three positions where a white candidate was hired over a similarly or higher scoring Black candidate during the 2021-22 and 2022-23 school years. *Id*. This suggests that the District does not always hire the highest-scoring individual—which allows for potential bias—even when hiring that candidate would facilitate faculty desegregation efforts. *Id*. And where schools with no Black teachers had the opportunity to fill vacancies from departing teachers, they chose to maintain their racial identifiability by filling the vacancies with white teachers. *Id.* at 30.

The 1978 Order mandated that "in no school attendance zone shall the overall principal and high school principal be of the same race, and in no event, shall all principals be of the same race," Dkt. 83-4 at 4, and that "[t]he heads of subject matter departments within the schools shall not be all of the same race." *Id.*[11] Despite these requirements, the District's own expert identified twelve schools in the District that had zero Black building administrators (principals and assistant principals) during the 2022-23 school year. Dkt. 98-2, tbl.2. In addition, many schools have leadership teams that are either all white or include only one Black faculty member. *See* Dkt. 89-13. When confronted with schools with all or nearly-all white leadership teams, Director Hollis stated that she had no concerns and, without evidence, assumed those disparities "mean[t] that those other blacks did not want to serve in that capacity." Hollis Tr. at 88:12-14. Director Hollis maintained this assumption despite having taken no steps to test that hypothesis or assess barriers to Black teachers serving on the leadership teams. *Id.* at 86:9-87:20, 88:12-17. Similarly, when confronted with schools that have only white principals and assistant principals in violation of the Operative orders, Director Hollis was not concerned because "I don't know . . . if there was a candidate that was better than the one that was selected." *Id.* at 91:2-4. These assumptions are, without more, insufficient to meet the District's heavy burden of "clear and convincing evidence" that these disparities in violation of the operative orders are not the result of discrimination. *Conecuh Cnty.*, 634 F.2d at 963-64.

---

[11] As the District notes in its motion, the Order's mandate regarding subject matter departments was intended to reflect "leadership or influence outside of the classroom," but "[t]oday, each school has a leadership team" that provides opportunities for teacher leadership. Dkt. 99 at 18. But racial disparities persist among the leadership teams. Dkt. 89-13.

### c. The District Has Not Complied in Good Faith with the Court Orders, Much Less Taken All Practicable Steps to Eliminate Discrimination.

To become unitary, the District must "do more than abandon its prior discriminatory purpose." *Dayton*, 443 U.S. at 538. Instead, the District must "ma[k]e every reasonable effort" and "take all steps necessary to eliminate the vestiges of [its] unconstitutional *de jure* system." *Fletcher*, 805 F.3d at 601; *Freeman*, 503 U.S. at 485. The District "asserts that it has made every effort to actively increase the representation of African Americans in the composition of its faculty and certified staff." Dkt. 99 at 21. But the District has failed to explore several strategies to reduce faculty desegregation, including expert-recommended strategies and approaches that District staff have recommended. Instead, the District has relied on unfounded assumptions that Black candidates and faculty are not interested in positions or promotion.

First, the District has failed to adopt known and recommended best practices for advancing desegregation through recruitment and intra-district transfers. The District cites, without evidence, a decrease in "the number of available and qualified African American candidates for faculty positions." Dkt. 99 at 19. Dr. Frankenberg recommended that the District consider recruiting through "diversity-focused online educator job boards" and "outside of Mississippi" given the likelihood that "southeastern states . . . have high numbers of Black teachers candidates." Frankenberg at 36. Despite this, the District has not identified or even looked for websites, listservs, or other job boards for Black educators where it can post vacancies. Hollis Tr. at 136:12-18. Instead, the District's Director of Human Resources, who oversees recruitment efforts, expressed doubt that recruiting out-of-state candidates, including those enrolled at historically Black colleges and universities, is worthwhile because "how many of those actually are interested and apply?" *Id.* at 126:20-127:3. The District has also refused to document, track, or systematize

its existing outreach to historically black fraternities and sororities about vacancies, relying solely on "word of mouth . . . [as] the best form of data." *Id.* at 207:8-25.

Given the persistent faculty segregation and low number of Black teachers in the District, Dr. Frankenberg observed that she would "expect focused efforts in schools that have racially identifiable faculties." Frankenberg at 36. Because "[a]ssignment of existing faculty need not await nondiscriminatory hiring of new teachers," *Lawrence Cnty.*, 799 F.2d at 1041, Dr. Frankenberg further observed that the District could adopt "voluntary incentives for teacher transfers or targeted recruiting efforts in hiring processes." Frankenberg at 29. Director Hollis stated that the District had not tried monetary incentives and would not consider non-monetary incentives because of her assumption that they would "not be effective" and would likely "break[] . . . state codes." Hollis Tr. at 113:2-5, 113:21-114:2, 117:10-118:2. Director Hollis did not identify any such codes and admitted that she had not asked staff whether non-monetary incentives would be appealing. *Id.* at 114:6-115:8, 117:10-118:2. Director Hollis also stated that the District has not considered targeted recruitment for intra-district transfers because she found it "highly offen[sive]." *Id.* at 119:19-120:2. In other words, the District has declined to explore expert-recommended recruitment and incentive strategies not because of feedback from staff or other evidence, but based on administrators' own assumptions.

The District has also failed to fully implement strategies that its own staff recommend to increase Black recruitment. For example, Director Hollis opined that the District could follow up with prospective applicants after career fairs via postcard or an individualized email, especially if they have not yet applied, but the District has not rolled out this practice. Hollis Tr. at 55:1-57:7. Director Hollis also recommended conducting on-the-spot interviews at career fairs to increase applications and expedite hiring of interested candidates. *Id.* at 58:2-15, 60:14-16. But the District

does not currently use this practice at all career fairs. *Id*. at 64:22-23. In addition, while the District currently has several partnerships with historically Black colleges and universities to recruit potential educators, the District does not conduct presentations at most of those universities to advertise the programs, *id*. at 145:4-10, and does not have an established system of meeting with program participants to encourage or support them in applying to the District. *Id*. at 140:5-16, 143:23-144:2. The District has not "ma[d]e every reasonable effort to eradicate segregation and its insidious residue," *Fletcher*, 805 F.3d at 601, where it has not even implemented its own proposed strategies or made use of existing programs.

Second, the District has failed to employ basic strategies to address discrimination in hiring, including by enforcing its own policies. For example, the District encourages and recognizes the benefits of diverse hiring committees, but does not require that they be used. Hollis Tr. at 159:7-11. And while the District employs standard interview questions that should be asked across all candidates to ensure that candidate scores can be compared, *id*. at163:12-14, 168:12-19, District schools deviate from the required questionnaire without permission or documentation. *Id*. at 163:25-164:4. Similarly, while the District's Director of Human Resources would not recommend evaluating candidates using different rubrics, hiring committees have done so on multiple occasions. *Id*. at 171:9-20, 173:1-6. These admissions are especially concerning in light of the fact that when Black candidates score competitively on hiring rubrics, they are in some instances rejected in favor of a white candidate with the same or lower score. Frankenberg at 34. Moreover, the District is aware of stigma and complaints that it does not hire Black candidates. Ex. I, April 9 Deposition of Undray Scott ("4/9 Scott Tr.") at 217:11-218:5; Hollis Tr. at 147:3-9, 148:8-17. Despite these trends and concerns, the District has declined to implement a policy requiring hiring managers to make every effort to hire faculty that advance desegregation or a

policy requiring hiring managers to justify selecting a white candidate over a Black candidate with a higher score. Hollis Tr. at 178:19-24, 180:9-181:6, 181:14-17. And despite concerns about attrition and the isolation of Black faculty at several District schools, the District has not used past surveys to assess the impact of race discrimination and bias on staff. *Id.* at 182:18-184:4, 185:7-10.

Third, the District has failed to even properly monitor compliance with the operative court orders. For example, the District's own expert did not evaluate the District's compliance with key provisions of the orders, including the requirement to attain "28% [Black] staff at every level and in all categories" and to ensure proportionate Black representation in faculty committees, hiring, assignment, and promotion. Rossell Tr. at 103:22-104:9, 105:16-25; *see* Dkt. 83-4 at 5. Similarly, the District's Director of Human Resources does not regularly review data on promotions by race, pay by race, or department heads by race, despite that data being available to her. Hollis Tr. at 36:2-12, 39:9-22, 76:15-25. She also does not review data on the racial composition of school leadership teams because it is on "a voluntary basis" so she "would have no reason to assume or speculate that there is a racial disparity there." *Id.* at 84:6-9. Instead, the District frequently relies on the untested assumption that disparities in hiring, leadership, or promotions are due to lack of interest from Black candidates. For example, despite acknowledging persistent racial disparities among administrative employees, Director Hollis said the District need not take steps to improve representation in those positions "because I can't say that there is anybody that's black that really wanted a job that applied and just didn't get [it]." *Id.* at 52:25-53:2. Such unsupported assumptions are insufficient to show "clear and convincing evidence" that these disparities are not the result of persistent discrimination. *Conecuh Cnty.*, 634 F.2d at 963-64.

Because the District has not met its "heavy burden" of making all "reasonable, feasible, and workable" efforts to desegregate faculty, its motion fails. *Davis*, 721 F.2d at 1432, 1434.

## III. The District Has Failed to Eliminate Racial Discrimination in Quality of Education, Specifically Discipline.

Exclusionary discipline can negatively affect students' quality of education and, ultimately, their life trajectories.[12] Such referrals cost students valuable class time and are associated with lower grades and increased risk of failure on standardized tests and can lead students to feel negatively about their school and education. Ex. J, Expert Report of Jamilia Blake ("Blake") at 2. Indeed, children subjected to early and regular exclusionary discipline are more likely to graduate high school late or drop out altogether and face an increased likelihood of involvement with the juvenile justice system, which have negative consequences for future employment. *Id.* Studies reflect that these harms disproportionately affect Black students, who are regularly suspended more frequently and harshly than white students, even for the same infractions. *Id.* at 3.

Unsurprisingly, therefore, courts regularly consider "quality of education," which includes discipline, *see, e.g.*, *Borel*, 44 F.4th at 314-15, as a factor in determining whether a previously segregated school system has achieved unitary status, *see, e.g.*, *Freeman*, 503 U.S. at 473-74, 492-93. This Court has explicitly retained jurisdiction over quality of education in this case, *see* Dkt. 90 at 1–2, and the District acknowledges its obligations to ensure that its students are disciplined in a non-discriminatory manner, *see* Scott 4/9 Tr. at 102:9-24 (discussing investigation of racial

---

[12] Exclusionary discipline measures are those for which students are removed from a classroom, usually in the form of in-school or out-of-school suspensions. *See* Ex. J, Expert Report of Jamilia Blake at 2. Plaintiffs focus primarily on exclusionary discipline because of the extent to which it disrupts students' learning and also because the District does not reliably track less severe forms of disciplinary intervention. *See* Scott 4/9 Tr. at 105:24-106:11 (defining "major" as "either an out of school suspension or in school suspension . . . anything that takes [students] out of the class"), 107:5-17 (District policy requires tracking major but not minor removals).

disparities in discipline "to make sure that there were no racial disparities . . . of course due to the *Adams* case").

As with other desegregation factors, the District has the burden of demonstrating that it has worked in good faith to eliminate the vestiges of prior discrimination to the extent practicable in discipline. *See, e.g.*, *Thomas*, 544 F. Supp. 3d at 720-21. In its motion, the District claims to be "fully desegregated" with respect to discipline, Dkt. 98 at 5-6, but it provides no factual or legal support for that claim, *see* Dkt. 99 (discussing student assignment, faculty and staff, and extracurriculars, but silent with respect to discipline or quality of education). The District's failure to attempt to justify its conclusory claim that it is unitary in discipline is completely inconsistent with its burden and is sufficient reason to deny its motion with respect to discipline.

In any event, the District cannot satisfy its burden in this area. RCSD has an obligation to "eliminate the effects of prior *de jure* segregation, 'root and branch' by coming forward with a plan that promises realistically to work, and promises realistically to work now." *Thomas*, 544 F. Supp. 3d at 691-92 (internal quotation marks and citation omitted). It has not done so. First, racial disparities in discipline persist in the District—as discussed in more detail below, Black children are punished more often than white children, even controlling for other relevant variables. Such "observed racial disparities in discipline," supported, as they are here, by statistical analysis, are regularly accepted "to identify the vestiges of discrimination in a school system." *See id.* at 723-24 (citing cases). Second, the District maintains an ad hoc system of discipline, lacking objective standards and guidelines, that is susceptible to inconsistent and potentially biased enforcement. The Court should deny the District's motion with respect to discipline.

**a. Race-Based Disparities in Discipline Persist in the District.**

Although the District recognizes its obligation, as part of this case, to eliminate racial disparities in discipline to the extent practicable, *see, e.g.*, Scott 4/9 Tr. at 102:9-24, discipline in

the District remains significantly racialized. Dr. Jamilia Blake, a nationally recognized expert in racial/ethnic and gender disparities in school discipline, *see* Blake at 1, reviewed five years[13] of the District's discipline data and concluded—using conservative analyses that favor the District—that Black students are punished more frequently than similarly situated white students.

First, from 2019-2024, the District consistently suspended Black students at higher rates than white students.[14] *Id.* at 9-10. Moreover, the relative risk ratios[15] for students' first suspensions illustrate that Black students are "more than [1.5] to 2 times more likely to be suspended than were White students."[16] *Id.* at 10. Finally, Dr. Blake ran a multilevel logistical regression analysis, controlling for school and student characteristics, and determined that Black students are significantly more likely to be disciplined than white students. *Id.* at 11 & tbl.4.

Consistent with Dr. Blake's findings, the District acknowledged that the "current state of racial disparities in discipline in the district" is that, "as a whole, [the district is] overidentified," meaning that Black children are disciplined at a rate higher than their proportion of the overall population. Scott 4/9 Tr. at 134:8-135:5; *see also* Rossell Tr. at 150:25-151:3 (acknowledging that Black students are disproportionately suspended in RCSD); *infra* at Section III(b). Indeed, the District notes that even though exclusionary discipline in the district has been trending down

---

[13] Dr. Blake did not calculate a relative risk ratio for the 2020-21 school year because of insufficient data. Blake at 10-11.

[14] Black students, generally, and Black male students, specifically, were the most frequently suspended groups of students in every year analyzed by Dr. Blake. *See* Blake at 9–10 & tbl.1. Under Dr. Blake's descriptive suspension rate analysis, Black female students were suspended at a substantially higher rate than white female students in all years analyzed and were the most suspended group of girls overall in all years except for 2020-21 and 2021-22, in which Hispanic female students were suspended at higher rates. *See id.*

[15] The relative risk ratio estimates the likelihood of Black students receiving a suspension relative to that of white students and is a common statistic for assessing racial disparities in discipline. *See* Blake at 7-8.

[16] Dr. Blake's analysis notes three minor exceptions to the overall trend that did not affect or undermine her overall conclusion. *See* Blake at 10-11.

overall, in the 2023-24 school year, exclusionary discipline of Black students increased. Scott 4/9 Tr. at 145:19-148:7. The District could not state whether that trend has since been corrected.[17]

In sum, Dr. Blake concluded, based on "three independent metrics and methods for assessing racial disproportionality," that there is a "clear pattern of racial bias in discipline sanctions issued by the District." Blake at 14. Moreover, she arrived at this conclusion controlling for other school-level variables included in the District's data set.[18] *See, e.g.*, Blake at 11-12. These statistical race-based disparities reflect vestiges of discrimination and merit denial of the District's motion with respect to discipline. *See, e.g.*, *Thomas*, 544 F. Supp. 3d at 723-24 (accepting such evidence and citing cases supporting that "[s]uch statistical analyses have been accepted in other circuits to identify the vestiges of discrimination in a school system"); *see also, e.g.*, *Lee v. Etowah Cnty. Bd. of Educ.*, 963 F.2d 1416, 1426 (11th Cir. 1992) (reversing grant of unitary status based, in part, on statistical evidence of racial disparities in discipline).

**b. The District Has Made Insufficient Efforts to Eradicate the Vestiges of Segregation.**

An examination of the District's discipline policies and practices reveals how it has failed to eliminate vestiges of discrimination in this area. Lacking objective standards and guidelines, the District primarily employs ad hoc, trial-and-error methods for identifying and responding to discipline issues that are, at best, ineffective and, at worst, invite biased and inconsistent outcomes.

---

[17] Dr. Blake similarly describes a racial gap in discipline between Black and white students that is not narrowing and, at some levels of education, is widening. Blake at 12-13.

[18] While the District neither advanced any argument nor presented expert testimony in support of its claim that it has achieved unitary status with respect to discipline, its expert, Dr. Rossell, submitted a "Rebuttal Report" purporting to "analyze the reports of Dr. Erica Frankenberg and Dr. Jamillia [*sic*] Blake." Dkt. 147-2 at 1. Dr. Rossell does not meaningfully rebut any of Dr. Blake's findings, however, asserting only that Dr. Blake "does not mention the fact that low socioeconomic (SES) students commit more suspendable offenses and black students have much lower SES than white students." *Id.* at 9. Dr. Rossell provided no support, statistical or otherwise, for that assertion. *See id.* Moreover, the District does not track socioeconomic status in the context of discipline. Scott 4/9 Tr. at 141:2-5; Blake at 5. Indeed, Dr. Rossell admits that she requested but was not provided "data on the poverty level of students by race in Rankin County" because the District does not maintain such data. Rossell Tr. at 30:13-31:1.

The District's policies and procedures do not reflect a serious—let alone "every reasonable"—effort to eliminate the vestiges of segregation. *Thomas*, 544 F. Supp. 3d at 663.

The District's discipline policies consist of a handful of brief, high-level statements and rules that provide no meaningful guidance to employees.[19] *See, e.g.*, Ex. K (Student Conduct Policy); Ex. L (Student Discipline Policy); Ex. M (Code of Conduct). For example, the District's Code of Conduct contains ambiguous terms—such as "neatness and cleanliness of personal attire and hygiene," "respect[ing] the personal property of others," and "refrain[ing] from . . . creating disturbances," Ex. M, at 1 (Code of Conduct)—that are undefined, within the document or otherwise. *See* Scott 4/9 Tr. at 162:19-163:23. Worse, the District does not train staff on how to interpret or implement its discipline policies. *Id.* at 179:1-180:1. The Code of Conduct also lacks meaningful accountability measures for ensuring that policies are implemented in an unbiased manner or that faculty and staff are following the District's mandates. *See id.* at 93:17-94:5, 95:15-96:11. The District therefore effectively affords nearly unfettered discretion to school-level staff to punish children and to even do so inconsistently.

Relatedly, while the District claims to monitor data and trends relating to racial disparities in discipline, *see, e.g.*, *id.* at 102:9-13, it does not meaningfully do so. First, the District has no specific plan for addressing racial disparities in discipline—it merely tries to "prevent discipline as a whole." *Id.* at 103:8-104:2, 119:13-120:5; *see also id.* at 148:3-7 (no information that the District has proposed a solution to a specific observed disparity in discipline). The action it purports to take is inadequate. It compares the percentage of disciplined children who are Black, for example, with their proportion in the overall population. *Id.* at 107:25-108:22. Where students

[19] The district-level guidelines effectively set a floor for discipline; each school develops and submits a more detailed yearly behavior plan. *See, e.g.*, Scott 4/9 Tr. at 152:16-153:14. The District provides a "template" with areas of concern, leaving schools to develop details at their discretion. *Id.* at 155:8-156:11.

are disciplined at a higher rate than their share of the population, the District deems them "overidentified." *Id.* at 134:22-135:5. This is effectively comparing a risk index, *see* Blake at 7-8, to a baseline set by the general population, but the District merely eyeballs the data and, if the ratio is at all higher than the baseline, it would be "considered . . . a problem." Scott 4/9 Tr. at 111:18-113:22. Worse, the District allows itself, on an ad hoc basis, devoid of objective standards, to disregard any data set that it believes has been "skewed" by an individual child or children (it is unclear how many is sufficient) having been disciplined multiple times (it is unclear how many times is too many). *See id.* at 108:23-109:21, 113:23-116:19, 117:13-119:12.

If the District were truly interested in understanding racial disparities in discipline, it would consider *all* relevant data, applying objective standards and using statistical tools to account for potential variables and/or identify significant variations from the baseline while also tracking data trends over time to measure progress. Instead, it vaguely assesses disparities in the data that purports to consider while completely ignoring data potentially indicating racial disparities where it asserts, unmoored from any objective standard, that the data set is skewed. Under these circumstances, this Court cannot grant the District's motion; it cannot be confident that the District understands the full scope of—let alone that it can solve— racial disparities in its discipline system. *Cf. Thomas*, 544 F. Supp. 3d at 701 ("The Court struggles to comprehend how one can reasonably expect to achieve a goal without even knowing what the goal is or where the efforts need to be focused."); *id.* at 723 ("The District's lack of a tracking or monitoring mechanism shows a lack of commitment to using non-exclusionary discipline.").

In addition, for an overidentified school, the District defers to school-level officials—i.e., the people presumably responsible for the disparities—to identify a reason for the disparity and propose a solution. Scott 4/9 Tr. at 125:21-127:10. It provides no training, guidance, or oversight

to employees in this regard. *Id.* at 130:4-133:10. School officials' responses, again, are proposed on an ad hoc basis, and effectively adopted via trial and error. *Id.* at 120:10-123:2.

The District's approach to discipline for individual students is similarly flawed. Each school has discretion to identify a child as meriting discipline-related attention or intervention from the District. *Id.* at 81:2-82:16. The District offers no objective guidelines or standards to inform that decision, allowing school officials discretion to take action on anecdotal (or any other) bases, and the District has no mechanism for ensuring that that bias does not infect the decision, *id.* at 100:12-101:4, despite the District's acknowledgment that bias can and does improperly influence such decision making, *id.* at 97:23-98:5. Finally, behavioral interventions are again, proposed on an ad hoc basis, with no objective guidelines to ensure that Black students are not receiving differential treatment from similarly situated white students. *Id.* at 84:2-86:13, 87:7-90:8.

The District's system does not come close to supporting a finding that it has made "every reasonable effort" to eradicate to eradicate the vestiges of segregation in discipline. *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th Cir. 2008). The District's must "systematically design, select, and implement effective intervention programs," *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 755-56 (8th Cir. 2011) (discussing student assignment), and craft a plan that "promises realistically" to eliminate the vestiges of segregation, *Green*, 391 U.S. at 439. Its current approach of unreliably interpreting its discipline data and relying on arbitrary and discretionary responses to address disparities cannot satisfy this standard.

## IV. <u>**The District Has Failed to Eliminate Racial Discrimination in Extracurricular Activities.**</u>

"[F]ull integration of [] schools means full integration of all . . . extracurricular activities and programs." *Plaquemines Par. Sch. Bd. v. United States*, 415 F.2d 817, 832-33 (5th Cir. 1969). A constitutional violation persists where it is "possible to identify a 'white school' or a '[Black]

school' simply by reference to . . . the organization of sports activities," student clubs, or their faculty supervisors and coaches. *Swann*, 402 U.S. at 18. In this case, in response to allegations that the District changed its dismissal time to earlier in the day to avoid integration of extracurricular activities, the Fifth Circuit instructed the Court to "take all steps necessary to eliminate all vestiges of a dual system including both curricular and extracurricular activities, social, athletic, musical and other groups." *Adams*, 485 F.2d at 327-28. That directive continues to guide the Court's assessment of the District's desegregation of extracurricular activities.

To determine whether a school district has met its burden, courts consider whether a school district affirmatively encourages minority students to participate in extracurriculars, has eliminated explicit race-based criteria, and has removed facially neutral policies that foster segregation. *See Bazemore v. Friday*, 478 U.S. 385, 407 (1986) (White, J., concurring); *Quarles*, 868 F. 2d at 757-58; *Coal. to Save Our Children v. State Bd. of Educ.*, 90 F. 3d 752, 768-69 (3d Cir. 1996). Most fundamentally, the Court looks to whether there is "racial diversity across the board," *Mississippi*, 2011 WL 13389133, at *14, and whether there are any "racial barrier[s] to any student participating in any extracurricular activity," *Singleton v. Jackson Mun. Separate Sch. Dist.*, 541 F. Supp. 904, 908 (S.D. Miss. 1981).

Where school activities are dominated by one race, the Court should evaluate whether the district requires all extracurriculars to be "open to all students regardless of race," whether it "encourages teachers of both races to serve as activity sponsors," whether these "teachers are then entrusted with enforcing the school district's nondiscrimination policy," and whether racial identifiability is solely the result of "the voluntary and unfettered choice of the [school's] students." *Quarles*, 868 F.2d at 757. For activities in which participation is restricted by a tryout, audition, election, or application process, the Court must scrutinize further to look for "detailed policies that

have been promulgated in an effort to encourage interracial participation." *Id.* Such policies must be in place "for a reasonable period of time" for the District to show "that it has complied with its desegregation obligations." *Mississippi*, 2011 WL 13389133, at *14.

**a. Racial Disparities Persist in the District's Extracurricular Activities.**

The District's cursory discussion of extracurricular activities in its motion falls short of its burden to demonstrate that it has complied in good faith with its obligations under the operative Court orders and eliminated the vestiges of segregation to the extent practicable. Evidence shows the District has done neither.

First, Black students are underrepresented in many extracurricular activities in the District, despite the 1978 Order's directive that "all schools shall be operated without racial discrimination and in the manner which assures proportionate black participation [in] all student and faculty activities." Dkt. 83-4 at 4. The District's expert's conclusions to the contrary are not reliable: Dr. Rossell opines that Black students participate in extracurricular activities at each middle or high school at levels close to their proportion of the student body and that the racial imbalance of activities is quite low. Dkt. 98-2 at 11. These conclusions, however, are based on calculations using all minority students rather than isolating Black students, Rossell Tr. at 130:6-18, which inflates the numbers she attributes to Black student participation by more than 25%.[20] Focusing on Black students, the data show that in 2023-24, there were 43 activities in the District with zero Black students, and these activities were clustered primarily at Florence, Pisgah, and Puckett high schools. Ex. N, Student Extracurricular Racial Composition for 2023-24.[21] Across the District, there are also many activities with persistent underrepresentation of Black students. High school

[20] For example, in the 2023-24 school year, there were 5,023 Black students in the District and 1,171 other non-white students. Dkt. 98-2 at tbl.1.

[21] The same chart, minus Plaintiff counsel's highlighting, appears in the record as Exhibit T to the District's Motion for Declaration of Unitary Status. *See* Dkt. 98-20.

activities where Black students were roughly 15% or less of participants district-wide in each of the last three school years include varsity baseball, boys' varsity soccer, girls' varsity soccer, archery, Future Farmers of America, HOSA, varsity fast-pitch softball, diamond girls, and varsity cheer.[22] These are among the most popular activities in the District based on enrollment numbers, *see* Ex. N (Student Extracurricular Racial Composition), so their low Black participation cannot be attributed to small size. Their racial imbalance and the utter absence of Black students in many activities indicates the District has failed to comply with the 1978 Order.

Black coaches and sponsors are also underrepresented among District extracurricular staff despite the 1973 Order's requirement that the District must "assign an integrated team of faculty sponsors" for its "extra-curricular and social activities and events." Dkt. 83-3 at 3. While the District claims it has an "integrated roster," Dkt. 99 at 23, the data reveals that the overall proportion of Black coaches and sponsors in the District is low (16%), and at some schools, their numbers are extremely limited or altogether absent. Dkt. 98-11. In 2023-24, none of the thirty coaches and sponsors at Pisgah High School were Black, and only two of twenty-five at Puckett High School were Black. *Id.* While the lack of Black extracurricular staff is certainly linked to the District's overall challenges in hiring and retaining Black faculty, *see supra* Section II, it also bears on the question of unitary status on extracurricular activities as coaches and sponsors play a key role in encouraging and selecting students to participate. *Freeman*, 503 U.S. at 497 ("*Green* factors may be intertwined or synergistic . . . so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses" the other.).

---

[22] *See* Ex. O, summary chart calculated from data produced by RCSD on August 29, 2023 in response to the Department of Justice's July 3, 2023 Request for Information 3(a) and data contained in Exhibit T to the District's motion, Dkt. 98-20. Varsity cheer at Pisgah High School was not included in this calculation due to an error in that data. *See* Stocks Tr. at 176:4-25.

The lack of Black extracurricular students and/or staff in Puckett, Pisgah, and Florence high schools signals that these schools are for white students. *See Green*, 391 U.S. at 435. Indeed, these schools were historically operated in white attendance zones under *de jure* segregation, Dkt. 83-1 at 4, and Pisgah High School has been racially identifiable in both its student enrollment and faculty composition at times in the last five years, Frankenberg at 8-9.

Finally, the District's motion is short on detail regarding its efforts to comply with its desegregation obligations. The District claims it "encourages participation regardless of race" and "has successfully undertaken efforts in eradicating any evidence of segregation regarding extracurricular activities," Dkt. 99 at 22-23, but provides no supporting evidence or even a description of these efforts.[23] The District also fails to address school activity selection methods, which the Court's 1978 Order identifies as the critical mechanism fostering inclusion of Black students. Dkt. 83-4 at 4. Specifically, the Order dictates that "methods of selection of students to participate in activities such as student council, cheerleading squads and the like, shall be altered to insure the inclusion of black students." *Id.* But the District provides no specific evidence on this point, citing only to brief general policies governing student activities and organizations, which contain a one-sentence non-discrimination statement[24] and do not address selection methods. Dkt.

---

[23] Plaintiffs acknowledge the District's Fee Policy allows for school-related fees to be waived upon a showing of financial hardship. Dkt. 98-19. A properly implemented fee waiver policy is crucial to desegregation efforts because fees and costs can pose a barrier to Black student participation in extracurriculars; for example, Florence High varsity cheer charges approximately $1,600 in fees. Stocks Tr. at 177:1-21, 180:12-22. The Fee Policy's language, however, is unclear as to whether it allows for waiver of extracurricular activity fees, but District administrators testified that the District permits waiver of such fees. The District intends to better communicate information about fee waivers and clarify the language of the Fee Policy in the 2025-2026 school year. *Id.* at 180:24-181:11.

[24] A non-discrimination policy alone is not sufficient. *See Morgan v. Nucci*, 831 F.2d 313, 329 (1st Cir. 1987) ("[T]he fact that a particular school policy or program may be 'racially neutral,' in that it no longer reflects discriminatory animus, does not prove that the effects of prior discrimination have been purged."); *accord Freeman* 503 U.S. at 516 ("It is not enough that [the district] adopt race-neutral policies . . . . Instead, [it] is obligated to 'counteract the continuing effects of past school segregation.'" (quoting *Swann*, 402 U.S. at 28)).

98-18. This showing does not demonstrate compliance with the 1973 Order or provide evidence of "detailed policies" intended "to encourage interracial participation," *Quarles*, 868 F.2d at 757, nor does it enable the Court to make precise factual findings regarding the District's efforts. *See Dowell*, 498 U.S. at 246. Details of schools' selection criteria or tryouts are critical to the Court's assessment of unitary status—especially in light of Black underrepresentation—because prerequisites, fees, appearance or style requirements, and standardless or subjective factors can introduce bias and pose barriers to Black student participation.

Accordingly, the District has not satisfied its burden to show good-faith compliance with the relevant court orders and demonstrate that it has eradicated the vestiges of segregation in extracurricular activities to the extent practicable.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the District's motion.

Respectfully submitted this 5th day of May, 2025

Jennifer A. Holmes*
Gabriel Diaz*
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, D.C. 20005
Tel: (202) 682-1300
jholmes@naacpldf.org
gdiaz@naacpldf.org

Counsel for Plaintiffs
* Admitted pro hac vice

/s/Amir Badat
Amir Badat (Mississippi State Bar No. 106599)
Badat Legal
4264 E. Ridge Drive
Jackson, Mississippi 39211
Tel: 601-462-9592
amir.badat@gmail.com

Ashley Burrell*
Katrina Feldkamp*
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
aburrell@naacpldf.org
kfeldkamp@naacpldf.org